FIRE ASSOCIATION OF PHILADEL-
PHIA, a corporation; Merchants Fire
Assurance Corporation of New York, a
corporation; Mercury Insurance Com-
pany, a corporation; Michigan Fire &
Marine Insurance Company, a corpora-
tion; North River Insurance Company,
a corporation; Philadelphia Fire & Ma-
rine Insurance Company, a corporation;
Springfield Fire & Marine Insurance
Company, a corporation; Transconti-
nental Insurance Company, a corpora-
tion, Plaintiffs,

v.

ALLIS CHALMERS MANUFACTURING
COMPANY, a corporation,
Defendant.

Civ. A. No. 775.

United States District Court,
N. D. Iowa, W. D.

March 14, 1955.

Sylvester F. Wadden, Harry H. Miller, of Sifford & Wadden, Sioux City, Iowa, for plaintiffs.

Wiley E. Mayne, of Shull & Marshall, Sioux City, Iowa, John H. Schlosser, Milwaukee, Wis., for defendant.

GRAVEN, District Judge.

The defendant is a corporation organized and existing under the laws of the State of Delaware. All of the plaintiffs

are corporations. They were organized and exist under the laws of States other than Delaware. The plaintiffs and the defendant have all qualified to do business in Iowa. The amount in controversy, exclusive of interest and costs, is in excess of $3,000.

The Iowa Public Service Company is a corporation organized and existing under the laws of the State of Iowa. It is engaged, among other things, in the generation, transmission, sale, and distribution of electricity in Northern Iowa and elsewhere. At Waterloo, Iowa, at what is known as Maynard Station, it maintains and operates an electric generating plant. In 1951 it completed the construction of a new switch house at its Maynard Station. For a considerable period of time in advance of the completion of the switch house, the Iowa Public Service Company had been planning for and negotiating for the purchase of electrical equipment to be placed in it.

The defendant is engaged, among other things, in the manufacture and sale of electrical equipment. Its principal place of business is at Milwaukee, Wisconsin. Its plant for the manufacture of electrical equipment is located at Boston, Massachusetts. It maintains a District Office at Kansas City, Missouri. J. F. Pritchard & Company was the agent of the Iowa Public Service Company in connection with the purchase and installation of the electrical equipment in the new switch house. The Iowa Public Service Company purchased from the defendant for use in the new switch house certain electrical equipment known as switchgear equipment. That equipment was installed by the Iowa Public Service Company. The equipment was contained in nine metal cubicles placed in a row in the switch house. The cubicles are referred to by Numbers 1 to 9.

On the morning of April 14, 1952, around 7:20 A. M., an employee of the defendant, in connection with the routine operation of the Station, operated the switch to put the equipment contained in Cubicle No. 2 in operation. In about ten minutes there occurred in the switch house what is described as fire and explosion followed by complete power failure. The mishap had its origin in Cubicle No. 2 due to unusually high heat that had been generated in it. The high heat almost completely destroyed Cubicle No. 2 and the equipment contained therein. It damaged Cubicles No. 1 and No. 3 so badly that they had to be replaced. Extensive fire and heat damage was also caused to the switch house and other equipment therein.

The plaintiffs had written insurance policies insuring the Iowa Public Service Company against losses of the kind occasioned by the mishap. They paid the Iowa Public Service Company the sum of $28,842.32 in settlement of those losses. In the subrogation receipts it is recited that the payments were made by the plaintiffs to the Iowa Public Service Company "for loss and damage by fire" paid by the plaintiffs. The sum did not include Cubicle No. 2 and the equipment contained therein which was replaced by the defendant at a cost of $8,165 without charge to the Iowa Public Service Company. The plaintiffs, as subrogees of the Iowa Public Service Company, seek in this action to recover the sum of $28,842.32 so paid by them. It is the claim of the plaintiffs that the defendant was guilty of negligence in the manufacture and inspection of the electrical equipment contained in Cubicle No. 2. The defendant denies the charge of negligence. The defendant also raises an affirmative defense. It contends that the equipment in question was purchased from it by the Iowa Public Service Company under a certain contract or contracts and that under a responsibility limitation provision contained therein the Iowa Public Service Company could not assert the claim now sought to be asserted by the plaintiffs and that the plaintiffs as subrogees of the Iowa Public Service Company may not do so. The plaintiffs deny that the equipment in question was purchased under the contract or contracts referred to by the defendant. In the alternative, it is the claim of the plaintiffs that if the Iowa

Public Service Company did purchase the equipment in question under the contract or contracts in question, the responsibility limitation provision contained therein is invalid. Further, in the alternative, it is the claim of the plaintiffs that if the Iowa Public Service Company did purchase the equipment in question under the contract or contracts referred to, and the responsibility limitation provision contained therein is valid, yet the claim herein asserted does not come within the scope of that provision. The contention of the defendant that the plaintiffs may not assert the claim they now seek to assert and the counter-contentions of the plaintiffs in that connection will next be considered. Since J. F. Pritchard & Company acted for the Iowa Public Service Company in connection with its purchase of the electrical equipment in question, the connection of J. F. Pritchard & Company with the purchase will be referred to as that of the Iowa Public Service Company.

It appears that the Iowa Public Service Company had sometime prior to August 17, 1948, sent to the defendant what is referred to as "purchaser's specification No. P–1251 dated 5/12/48," relating to the equipment for its Maynard Station. In response thereto, the defendant prepared specifications for the switchgear equipment of the type and kind desired by the Iowa Public Service Company. These specifications were dated August 17, 1948, and were labelled No. I–19–8A. On or about February 4, 1949, the defendant mailed to the Iowa Public Service Company a document entitled "Proposal and Contract." Submitted with and as a part of the "Proposal and Contract" were the specifications dated August 17, 1948, and labelled No. I–19–8A. On the first page of the "Proposal and Contract" the following appears in typewriting:

"This proposal covers one set of 15 KV Indoor Metal-Clad Switchgear as described and set forth in specification I–19–8A, submitted with proposal dated August 17, 1948."

In the "Proposal and Contract" there are a number of typewritten provisions. Most of them relate to the contract price for the electrical equipment described. In the provision which is designated as the "Base Proposal" the "contract price" is given as $46,669 plus $1,982 for a "Neutral Breaker." There is also included in the provisions relating to the "contract price" a number of Alternates designated as Alternate No. 1 through Alternate No. 6 inclusive. In Alternate No. 4 the "contract price" is given as $47,885 plus $1,982 for a "Neutral Breaker," or a total of $49,867. Other typewritten provisions in the "Proposal and Contract" relate to delivery and payment. The balance of the "Proposal and Contract" consists of printed provisions. Among the printed provisions is a responsibility limitation provision. The "Proposal and Contract" is on a standard form used by the defendant in connection with its sales. The "Proposal and Contract" has lines at the end for the signature of the defendant. At the end the following appears:

"Acceptance

"The foregoing contract is hereby accepted this ——— day of ———, 19—

"(Purchaser's)
(Firm Name) ———————

"By ———————————

"Title ——————————————"

The "Proposal and Contract" contains the following provision:

"This contract must be accepted by the Purchaser and returned to the Company within 30 days from its date, and shall not be binding upon the Company until so accepted and returned, and approved in writing by an executive officer of the Company."

The "Proposal and Contract" sent to the defendant was signed in behalf of the defendant by C. J. Schutty. That signed copy was received by the Iowa Public Service Company on March 4, 1949.

On March 10, 1949, the Iowa Public Service Company signed a document entitled "Purchase Order" and mailed it to the defendant at its Kansas City District Office. On the front of that document there appears, among other matters, the following:

"Purchase Order

| To | Allis-Chalmers Mfg. Co. | Order No. 251–43 |
|----|-------------------------|------------------|
| | Waldheim Building | |
| | Kansas City 6, Missouri | Req. No. 7477 |

Farnsworth:rv

| | |
|--|--|
| Date | Mar. 10, 1949 |
| Job No. | P–1251 |
| Acct. No. | see below |
| Terms: | Net cash 30 das. |

Mark Shipping Point
By F. O. B. frt. allowed. Via prepaid

| Item | Quantity | Description | Price |
|------|----------|-------------|-------|
| | | Confirmation | A/C# |
| **1** | 1 | 15–KV Indoor Metal-Clad Type KO Switchgear as described and set forth in Allis-Chalmers Specification No. I–19–8a Alternate #1, Revised August 17, 1948, and Allis-Chalmers Proposal dated February 4, 1949, Alternate No. 4, and to consist of 9 units 36″ wide, with total overall dimensions of 27 ft. long, 82″ deep and 118½″ high. | B/M 12.05 12–5 Item #32 |

\* \* \*

Shipment after Jan. 1, 1950. Will Notify Preferred Date Soon."

There were several pages attached to the "Purchase Order" which are designated as "Continuation Sheets" which contain specifications for the equipment. On "Continuation Sheet" designated as Page (6) the purchase price of the equipment is given as:

"Lump Sum Item #1 $47,885.00

15–KV, 600 AMP., 250–MVA, SPST neutral breaker
12–4
Item 2 12.04 1,982.00
$49,867.00"

That purchase price is the "contract price" contained and given in Alternate No. 4 of the defendant's "Proposal and Contract" of February 4, 1949, to which reference is made in the "Purchase Order."

On March 21, 1949, C. J. Schutty of the defendant's Kansas City, Missouri, District Office by letter acknowledged receipt of the "Purchase Order" of March 10, 1949. In the letter it was stated that the order was subject to acceptance at the defendant's main office.

It later developed that there was an error in the original set of specifications which had carried through to the "Purchase Order." Thereupon the defendant prepared revised specifications. The revised specifications are dated June 9, 1950, and are labelled No. I–19–8A. On June 15, 1950, the defendant mailed the Iowa Public Service Company copies of the revised specifications and a document entitled "Proposal and Contract." Attached to and a part of that "Proposal and Contract" is a copy of the revised specifications. The "Proposal and Contract" is dated June 9, 1950. It is signed at the end by A. W. Leighton. On the first page thereof the following appears in typewriting:

"This proposal covers one set of switchgear as described and set forth in the attached specification I–19–8A (Revised June 9, 1950)"

In the "Proposal and Contract" there are a number of typewritten provisions, including a provision as to the contract price. The contract price is set forth as $49,867. Other typewritten provisions relate to delivery and payment. The balance of the "Proposal and Contract" consists of printed provisions. Among the printed provisions is a responsibility limitation provision. This "Proposal and Contract" is made on the same standard form that was used for the "Proposal and Contract" previously referred to.

The documents dated February 4, 1949, and June 15, 1950, sent by the defendant to the Iowa Public Service Company are both designated "Proposal and Contract" on the first page thereof. In each instance that designation designates one and the same document. In the negotiations between the defendant and the Iowa Public Service Company when reference is made to either of those documents such document is referred to interchangeably as a "Proposal" or as a "Contract." Since the same document is designated both as a "Proposal" and as a "Contract," such document would seem to have the status of a "Proposal" until accepted by the purchaser after which it would have the status of a "Contract."

On June 21, 1950, R. E. Burlingame in behalf of the Iowa Public Service Company wrote a letter to the defendant containing a tabulation relating to the "sequence". Enclosed with the letter was a sketch sheet relating to the "sequence".

On August 2, 1950, the defendant wrote the following letter to the Iowa Public Service Company:

"cc: Omaha
"cc: Davenport
"cc: Mr. H. H. Ackmann
 "Switchgear Section
 "Electrical Department

"August 2, 1950

"J. F. Pritchard & Company
"908 Grand Avenue
"Kansas City 6, Missouri

"Attention: Mr. R. E. Burlingame

"Subject: Iowa Public Service Company
 Maynard Station—Waterloo, Iowa
 Your Job P–1251—File 12.0 P. O. 251–43—Our FR–4716–107
 Shop Order 1–1800–7393
 15 KV Air Blast Switchgear

"Gentlemen:

"Please refer to your 6/21/50 letter under the above subject and your single line sketch sheet B–231 which was attached.

"This will confirm that all equipment covered by Allis-Chalmers specification I–19–8A, revised June 9, 1950, will be built in accordance with the tabulation and sketch of your 6/21/50 letter. The prices and provisions of the contract remain unchanged.

"You will be pleased to note that our Switchgear Section informs us they are in complete sympathy with the suggestion included in the final paragraph of your letter. In the future, we will try to adhere to these practices.

"As noted in our 6/15/50 letter wherein we transmitted revised specifications, we understand that the subject purchase order will be reissued with reference to the corrected specification.

 "Very truly yours,
 "Allis-Chalmers Mfg. Co.
 " /s/ A. W. Leighton
 "By A. W. Leighton

"AWLeighton:mw
"In Quint."

On August 10, 1950, the defendant wrote the following letter to the Iowa Public Service Company:

"cc: Switchgear Section—
 Mr. H. H. Ackmann
"cc: Omaha Office
"cc: Davenport Office

"August 10, 1950

"J. F. Pritchard & Company
"908 Grand Avenue
"Kansas City 6, Missouri

"Attention: Mr. Byron Farnsworth

"Subject: Iowa Public Service Company
 Maynard Station—Waterloo, Iowa
 Your Job P–1251—File 12.0 P. O. 215–43—Our FR–4716–107
 Shop Order 1–1800–7393
 15 KV Air Blast Switchgear

"Gentlemen:

"Our 6/15/50 letter transmitted five copies of Allis-Chalmers specifications I–19–8A, revised June 9, 1950. These corrected specifications were made up specifically to correct an error in the original set which had carried through to the purchase order. The 15 KV 600 ampere, 250 MVA SPST neutral circuit breaker had in error been included twice in the previous papers.

"Our equipment will therefore be furnished in accordance with Allis-

Chalmers specifications I–19–8A, revised June 9, 1950 with the following exceptions:

"1. As previously noted in our 8/2/50 letter the switchgear will be built in accordance with Mr. R. E. Burlingame's 6/21/50 letter including a tabulation of the correct sequence and a sketch indicating same.

"2. Each of the included circuit breakers will be provided with a manual elevating mechanism and an electrical elevating mechanism.

"The two exceptions listed herein, involve no change in the price or provisions of the proposal and contract dated June 9, 1950.

"Very truly yours,
"Allis-Chalmers Mfg. Co.
" /s/ A. W. Leighton
"By A. W. Leighton
"AWLeighton/ld
"(In Quint.)"

On September 5, 1950, the Iowa Public Service Company signed a document entitled "Change Order" and mailed it to the defendant at its Kansas City, Missouri, District Office. On the front part of that document there appears, among other matters, the following:

"Change Order

Change Order No. 251–43 C/3
Date Sept. 5, 1950
Job No. P–1251

To { Allis-Chalmers Mfg. Co.
 1009 Waldheim Bldg.
 Kansas City 6, Missouri, } Ship To { J. F. Pritchard & Co.
 c/o Iowa Public Service
 Co.
 Waterloo, Iowa. }

Please refer to the original purchase order No. 251–43 and revise it to read as follows:

1. 1 15KV Indoor Metal Clad Type KO switchgear as described in Allis-Chalmers specification No. I–19–8A Revised June 9, 1950; Proposal dated February 4, 1949, Alternate No. 4 and letters dated August 2, 1950, and August 10, 1950, signed by A. W. Leighton and to consist of 9 units each 36" wide with total overall dimensions of 27 ft. long x 82 inches deep x 118½ inches high. * * *"

There were "Continuation Sheets" attached to the "Change Order." On what is designated as "Continuation Sheet—Page Six" the purchase price is $49,867. That purchase is the "contract price" contained and given in the defendant's "Proposal and Contract" dated June 9, 1950.

The equipment was then manufactured and delivered by the defendant to the Iowa Public Service Company at its Maynard Station and payment was made therefor by the Iowa Public Service Company. The equipment was installed in the new switch house in October, 1951. It was put into operation on November 16, 1951. The "Proposal and Contract" dated February 4, 1949, and the "Proposal and Contract" dated June 9, 1950, both contained a provision which provides that if the equipment was installed under the supervision of employees of the defendant the Iowa Public Service Company would reimburse the defendant for the services of such employees at the rate of $5 per hour for straight time and time and one-half for overtime and their expenses. Anthony Schalk, an engineer in the employ of the defendant, supervised the installation of the equipment. On November 16, 1951, the defendant billed the Iowa

Public Service Company for Mr. Schalk's time at the rate of $5 per hour for straight time and time and one-half for overtime and for his expenses. That bill was paid by the Iowa Public Service Company in December, 1951.

The Iowa Public Service Company did not sign on either the "Proposal and Contract" dated February 4, 1949, or the "Proposal and Contract" dated June 9, 1950. It kept both of them in its files. Both of them contain the following provision:

"Warranty: The Company warrants that the apparatus to be delivered hereunder shall be of the kind and quality described in the specifications, and no other warranty, except of title, shall be implied. The conditions of any tests shall be mutually agreed upon and the Company shall be notified of and may be represented at all tests that may be made. If any failure to comply with the specifications appears within one year from the date of shipment, the Purchaser shall notify the Company thereof immediately and the Company shall thereupon correct the defect, or defects, by repair, or by replacement f. o. b. factory of the defective part or parts. But if the apparatus is installed or its installation supervised by the Company, said one year shall run from the completion of installation, provided same is not unreasonably delayed by the Purchaser. The liability of the Company (except on warranty of title and on the liability respecting patents hereinafter set forth) arising out of the supplying of said apparatus, or its use, whether on warranties or otherwise, shall not in any case exceed the cost of correcting defects in the apparatus as above set forth, and, upon the expiration of said one year, all such liability shall terminate. The Company shall not in any event be liable for indirect or consequential damages."

It is not disputed that the plaintiffs are the subrogees of the Iowa Public Service Company and that as such subrogees they stand in the position of that Company. For convenience in reference, the "Proposal and Contract" dated February 4, 1949, will be referred to as the Proposal of February 4, 1949, and the "Proposal and Contract" dated June 9, 1950, will be referred to as the Proposal of June 9, 1950.

It is the contention of the defendant that the equipment in question was purchased from it by the Iowa Public Service Company either under the Proposal of February 4, 1949, or the Proposal of June 9, 1950, or both. The defendant apparently regards the two proposals so related that the Proposal of June 9, 1950, could be regarded as a modification of the Proposal of February 4, 1949. The defendant claims that whatever that situation might be, both proposals contain the same responsibility limitation provision and that such provision became a part of the contract between it and the Iowa Public Service Company.

The plaintiffs deny that the equipment in question was purchased by the Iowa Public Service Company under either proposal. The plaintiffs contend that the "Change Order" of the Iowa Public Service Company dated September 5, 1950, "marked a new start on the part of" the Iowa Public Service Company "to place an order" and that that order embraced "all revisions to date with the defendant" and that the minds of the Iowa Public Service Company and the defendant never met as to the inclusion of the responsibility limitation provision in the contract between them; and that, therefore, the Iowa Public Service Company never accepted that provision or agreed to be bound by it.

The plaintiffs call attention to the following provision, which has been heretofore referred to, which is contained in both of the contracts.

"This contract must be accepted by the Purchaser and returned to

the Company within 30 days from its date, and shall not be binding upon the Company until so accepted and returned, and approved in writing by an executive officer of the Company."

As heretofore noted, the Proposal of February 4, 1949, was signed by C. J. Schutty in behalf of the defendant, and the Proposal of June 9, 1950, was signed by A. W. Leighton in behalf of the defendant. It is not the claim of the plaintiffs that C. J. Schutty and A. W. Leighton were not executive officers of the defendant. It is the claim of the plaintiffs that there is no showing of acceptance within 30 days or any acceptance of either proposal.

■ Section 554.3, Code of Iowa 1954, I.C.A. (Uniform Sales Act), provides, in part, as follows:

"* * * a contract to sell or a sale may be made in writing (either with or without seal), or by word of mouth, or partly in writing and partly by word of mouth, or may be inferred from the conduct of the parties."

In 17 C.J.S., Contracts, § 34, page 362, it is stated: "Every agreement, whether written or oral, is the result of, and springs from, an offer and the acceptance thereof." In 17 C.J.S., Contracts, § 36, page 363, it is stated: "An offer is the signification by one person to another of his willingness to enter into a contract with him on the terms specified in the offer, * * *." A party who signs a proposed agreement and tenders such signed instrument to a party with whom he proposes to contract thereby makes an offer to such party in accord with the terms specified therein. Cohen v. New England Mut. Life Ins. Co., 7 Cir., 1944, 140 F.2d 1, 2, certiorari denied, 1944, 322 U.S. 744, 64 S.Ct. 1153, 88 L.Ed. 1576. The defendant by signing the Proposals of February 4, 1947, and June 9, 1950, and tendering them to the Iowa Public Service Company, thereby made an offer to the Iowa Public Service Company upon the terms specified therein.

However, the document containing the offer also contained a provision relating to the acceptance thereof. That provision provided that such offer must be accepted by the Iowa Public Service Company within 30 days from the date of the contract. On March 9, 1949, the Iowa Public Service Company executed the written "Purchase Order" dated March 9, 1949, and mailed it to the defendant. That instrument clearly and definitely related to the offer of the defendant dated February 4, 1949, and constituted a purported acceptance thereof. However, it was a belated acceptance. Section 73 of the Restatement of The Law of Contracts and Comment is as follows:

"An offeror who receives an acceptance which is too late or which is otherwise defective, cannot at his election regard it as valid. The late or defective acceptance is a counter-offer which must in turn be accepted by the original offeror in order to create a contract.

"*Comment:*

"*a.* How such a counter-offer as is referred to in the last sentence of the Section may be accepted depends on the general principles which govern acceptance. . * *"

In the Iowa Annotations to that Section of the Restatement (p. 53), it is stated:

"Ferrier v. Storer, 1884, 63 Iowa 484, 19 N.W. 288 (late acceptance of offer to borrow money), is in accord with the proposition that the offeror cannot at his election regard a defective acceptance as effective. This case would seem by inference to support the proposition stated in the section that a late acceptance may operate as a counter-proposal."

See also Wax v. Northwest Seed Co., 1937, 189 Wash. 212, 64 P.2d 513, 515. However, as heretofore noted, because of an error in the original set of specifications which was carried through into the "Purchase Order" dated March 9, 1949, new specifications were prepared

by the defendant. Thereafter the defendant tendered to the Iowa Public Service Company the contract dated June 9, 1950, which was based on the new specifications and which was signed by A. W. Leighton in behalf of the defendant. That proposed agreement constituted an offer to the Iowa Public Service Company upon the terms specified therein. However, the document containing the offer also contained a provision relating to the acceptance thereof. That provision provided that the offer must be accepted by the Iowa Public Service Company within 30 days from the date of the contract. On September 5, 1950, which was more than 30 days from the date of the contract, the Iowa Public Service Company executed the written "Change Order" dated September 5, 1950, and mailed it to the defendant. That "Change Order" clearly and definitely related to the offer of the defendant dated June 9, 1950, and constituted a purported acceptance of it. If that purported acceptance is regarded as an acceptance of the original offer of the defendant of June 9, 1950, it was a belated acceptance and constituted a counter-offer. On August 2, 1950, A. W. Leighton in behalf of the defendant wrote the Iowa Public Service Company a letter which has been heretofore set out. That letter contains the following paragraphs:

"This will confirm that all equipment covered by Allis-Chalmers specification I–19–8A, revised June 9, 1950, will be built in accordance with the tabulation and sketch of your 6/21/50 letter. *The prices and provisions of the contract remain unchanged.*

\* \* \* \* \*

"As noted in our 6/15/50 letter wherein we transmitted revised specifications, we understand that *the subject purchase order will be reissued* with reference to the corrected specification." (Emphasis supplied.)

By this letter of August 2, 1950, the defendant renewed its offer contained in the contract dated June 9, 1950, modified in accordance with the letter of the Iowa Public Service Company of June 21, 1950. In this letter of August 2, 1950, the defendant invited the acceptance of the renewed offer therein contained by the reissue of "Purchase Order". On August 10, 1950, A. W. Leighton wrote another letter to the Iowa Public Service Company, which has heretofore been set out, which provided in part:

"1. As previously noted in our 8/2/50 letter the switchgear will be built in accordance with Mr. R. E. Burlingame's 6/21/50 letter including a tabulation of the correct sequence and a sketch indicating same.

"2. \* \* \*

"The two exceptions listed herein, involve no change in the price or *provisions of the proposal and contract dated June 9, 1950.*" (Emphasis supplied.)

If the thirty-day limitation as to acceptance contained in the original offer of the defendant be regarded as applicable to the renewals thereof in the defendant's letters of August 2 and August 10, 1950, it is to be noted that written "Change Order" of the Iowa Public Service Company was issued on September 5, 1950, which was within 30 days from August 10, 1950, and that the defendant in its letter of August 10, 1950, invited the Iowa Public Service Company to accept the offer therein contained by the issuance of such order. However, if the "Change Order" issued by the Iowa Public Service Company on September 5, 1950, is to be regarded as a counter-offer by it, acceptance of that offer by the defendant would be necessary. The shipment of goods by the seller to the purchaser following receipt of a written order constitutes an acceptance thereof. Petroleum Products Distributing Co. v. Alton Tank Line, 1914, 165 Iowa 398, 146 N.W. 52. In that case the defendant executed and delivered to the plaintiff orders for three

tank cars of gasoline. The plaintiff shipped the defendant three tank cars of gasoline. The shipment of the gasoline was the only evidence of acceptance on the part of the plaintiff. The defendant, when sued for the purchase price of the gasoline, claimed lack of evidence of acceptance on the part of the plaintiff. A lower court judgment in favor of the plaintiff was affirmed. The Iowa Supreme Court stated, at page 54 of 146 N.W.:

"Acceptance of a contract may be proven by facts or circumstances, or by expressed words of acceptance. It may be shown by proving acts done, on the faith of the order, such as indicate an acceptance of the terms of the order. This may be shown by the shipment of the goods ordered. There is no evidence in this record that the defendants, after signing and delivering to the plaintiff the order in question, ever rescinded, or attempted to rescind, or cancel the orders. * * *"

A written order for a machine is accepted by the delivery of the machine. Aultman, Miller & Co. v. Nilson, 1900, 112 Iowa 634, 84 N.W. 692. This is true even though the written instrument submitted to the intended seller contains a provision that it is not to be binding on the seller as a contract until approved by such seller. Minneapolis Threshing Mach. Co. v. Zemanek, 1906, 130 Iowa 120, 106 N.W. 512. A written instrument signed by one party orally accepted and acted upon by the other party becomes the contract between them. McDermott v. Mahoney, 1908, 139 Iowa 292, 115 N.W. 32, 35, 116 N.W. 788.

Following the receipt of the "Change Order" issued by the Iowa Public Service Company on September 5, 1950, the defendant manufactured and delivered to the Iowa Public Service Company the machinery which was the subject matter of that "Order". If that "Order" is to be regarded as having the status of a counter-offer, then, under the authorities noted, such action on the part of the defendant constituted an acceptance of the counter-offer. As heretofore noted, that "Change Order" could be regarded as having the status of a valid acceptance of the defendant's offer as renewed. However, in either situation the question would be as to whether or not the resulting contract of sale included the responsibility limitation provision in question.

In order for a provision to be part of the contract between the parties the parties must have mutually asserted that it be a part of it. There must be a meeting of the minds as to its inclusion. In the case of Industrial Products Mfg. Co. v. Jewett Lumber Co., 8 Cir., 1951, 185 F.2d 866, later appeal, 193 F.2d 571, in a case in which the law of Iowa was applicable, the United States Court of Appeals for this Circuit stated, 185 F.2d at page 869:

"It is the contention of the defendant that there could not be a new contract between plaintiff and defendant because there was no 'meeting of the minds' of the parties, in that one party meant one thing by the words used in the telegram and letter by which the offer to buy the goods was made, while the other party who accepted the offer and manufactured and shipped the goods meant something else. The phrase adopted by the defendant—'meeting of the minds'—is an ancient and venerable term, and it is widely accepted that there must be a 'meeting of the minds' if there is to be a contract. The difficulty arises, however, in trying to determine when the minds of the parties have met. Defendant's position, in effect, is that only the terms in the minds of each of the parties to a contract constitute the terms of the contract, and that the mental processes of each party must concur before a contract can result. But courts are not so limited in their enforcement of contracts. On the contrary, it is what is expressed

by the parties that constitutes the contract which courts enforce. In Longmire v. Diagraph-Bradley Stencil Mach. Corp., Mo.App., 176 S.W. 2d 635, 646, it is said, 'Though there must be a meeting of the minds of the parties to constitute a contract, such meeting of the minds is to be determined by the expressed, and not by the secret, intention of the parties.'

"In Canister Co. v. National Can Corp., D.C., 63 F.Supp. 361, 365, it is well stated: 'It is true that mutual assent is an essential prerequisite of the formation of a contract. But the test as to whether there is mutual assent is objective and does not depend upon the undisclosed intentions of the parties. Since the test is objective, the formation of a contract does not require 'the meeting of the minds' of the parties. Despite early dicta to the contrary, this view is now almost universally accepted.' Holmes, in 'The Path of the Law', (10 Harv. L.R. 457, 464) says: 'In my opinion no one will understand the true theory of contract or be able to discuss some fundamental questions intelligently until he has understood that all contracts are formal, that the making of a contract depends not on the agreement of two minds in one intention, but on the agreement of two sets of external signs— not on the parties having meant the same thing but on their having *said* the same thing.' "

In the recent case of Rotterman v. General Mills, Inc., 1953, 61 N.W.2d 718, on pages 722 and 723, the Iowa Supreme Court stated:

"* * * The court must take an objective view in determining the parties' intent. It is not necessarily the actual intent we seek, but the intent manifested objectively. Union Republican Co. v. Anderson, 211 Iowa 1, 5, 232 N.W. 492;

Comptograph Co. v. Burroughs Adding Mach. Co., 179 Iowa 83, 159 N. W. 465; Seeger v. Manifold, 210 Iowa 683, 231 N.W. 479. We seek the intent a reasonably intelligent person would derive from the expressions used, under the circumstances and knowledge of the parties at the time of the transaction. Iowa Annotations to Restatement of Contracts, § 227, page 352; Williston on Contracts, Rev.Ed., Vol. 1, § 35; 12 Am.Jur. § 227, page 748."

■ If the "Change Order" issued by the Iowa Public Service Company on September 9, 1950, was a valid acceptance of the defendant's offer, then the parties assented to the provisions included in the offer, one of which was the responsibility limitation provision in question. If that "Change Order" had the status of a counter-offer, then the parties assented to the provisions included in that offer. Such provisions would include both the provisions contained in the "Change Order" itself and those included by reference.[1] The "Change Order" includes by reference the defendant's specifications No. I–19–8A Revised June 9, 1950, the defendant's Proposal dated February 4, 1949, and the defendant's letters of August 2, 1950, and August 10, 1950. The defendant's specifications No. I–19–8A were an integral part of its Proposal of June 9, 1950. The defendant's Proposal dated February 4, 1949, was a document which contained the responsibility limitation provision. The defendant's letters of August 2 and August 10, 1950, both made specific reference to the defendant's contract of June 9, 1950, which document contained the same provision.

The documents in evidence disclose that in every writing transmitted between the defendant and the Iowa Public Service Company during the course of the negotiations, except one, reference is made either to the defendant's "Proposal" or "Contract," which references are to documents which contain the re-

1. 3 Williston, Contracts, § 628 (Rev.Ed.1936).

sponsibility limitation provision. The exception is the letter of acknowledgment from C. J. Schutty dated March 21, 1949.

The written words used by the defendant and the Iowa Public Service Company during the course of their negotiations objectively manifested the intent on the part of both that the provisions contained in the document dated February 4, 1949, designated "Proposal and Contract" and in the document dated June 9, 1950, designated "Proposal and Contract," except as later modified, were included in the contract of sale. The responsibility limitation provision contained in those documents was not among the provisions which were later modified.

■ It is the holding of the Court that the responsibility limitation provision was a part of the contract of sale between the Iowa Public Service Company and the defendant. See Nelson v. Swedish Hospital, Minn.1954, 64 N. W.2d 38, where it was held that a responsibility limitation provision contained in a booklet and instructions which accompanied the dating of an X-ray machine was binding.

The plaintiffs' action is an action in tort based upon the claimed negligence of the defendant in the manufacture and inspection of the equipment contained in Cubicle No. 2. The plaintiffs do not claim that the defendant was guilty of a wilful, wanton or reckless wrong. The plaintiffs expressly assert that they are not suing for breach of warranty, either express or implied, or other contractual breach. It is the claim of the plaintiffs that the defendant was guilty of negligence as to the Iowa Public Service Company and that they may assert the claim of that Company based thereon against the defendant.

■ While a breach of contract is not a tort, yet a contract may establish a relationship between the parties or give them a status where the failure of either to exercise reasonable care would amount to a tort. Peitzman v. City of Illmo, 8 Cir., 1944, 141 F.2d 956, 961, certiorari denied, 1944, 323 U.S. 718, 65 S.Ct. 47, 89 L.Ed. 577, rehearing denied 323 U.S. 813, 65 S.Ct. 112, 89 L.Ed. 647; Smith v. Weber, 1944, 70 S.D. 232, 16 N.W.2d 537. See also Rice v. Sioux City Memorial Park Cemetery, Iowa 1953, 60 N.W.2d 110, 119, affirmed, 1954, 348 U.S. 880, 75 S.Ct. 122, 99 L. Ed. ——, citing Smith v. Weber, supra. In the case of Peitzman v. City of Illmo, supra, the Circuit Court of Appeals for this Circuit succinctly stated, 141 F.2d at page 961:

"* * * A tort is a wrong done independent of contract, but torts may be committed in the nonobservance of contract duties. * * Conduct that is merely a breach of contract is, of course, not a tort. However, a contract may establish a relationship and failure to exercise proper care or tortious and intentional wrong in performing it may give rise to a tort liability which is not defeated because there was a contract. * * *"

In the case of Smith v. Weber, supra, the South Dakota Supreme Court stated, at page 539 of 16 N.W.2d:

"It may be conceded that tort usually signifies a breach of legal duty independent of contract. But such breach of duty may arise out of a relation or state of facts created by contract. * * * While the matters complained of by plaintiff had their origin in a contract, the gist of the action is for alleged wrongful and tortious acts of defendant."

In the case of Randall v. M. M. Moen Co., 1928, 206 Iowa 1319, 221 N.W. 944, at page 945, the Iowa Supreme Court stated:

"It is often true in the transactions of men that the same act or event may constitute both a tort and a breach of contract. * * * A tort is a breach of a common-law duty. The injured party to a contract may elect whether to sue for

the breach of his contract or to sue in tort. If he sue for breach of contract, he waives the tort; and, if he sues in tort, he waives the breach of contract. He may ride either horse, but not both."

Where the same act or omission constitutes both a breach of contract and a tort, the matter of whether the plaintiff proceeds in tort or on contract may be of legal significance. Many of the courts hold that a more liberal rule as to damages prevails if the action is in tort. 15 Am.Jur. p. 405. The Iowa Supreme Court is among the courts which so hold. Mentzer v. Western Union Tel. Co., 1895, 93 Iowa 752, 62 N. W. 1, 28 L.R.A. 72. In that case the Iowa Supreme Court, after referring to the case of Hadley v. Baxendale, 9 Exch. 341, in connection with the matter of damages for a breach of contract, stated, at page 3 of 62 N.W.:

"* * * In actions for tort the rule is much broader. The universal and cardinal principle in such cases is that the person injured shall receive compensation commensurate with his loss or injury, and no more. This includes damages not only for such injurious consequences as proceed immediately from the cause which is the basis of the action, but consequential damages as well. These damages are not limited or affected, so far as they are compensatory, by what was in fact contemplated by the party in fault. He who is responsible for a negligent act must answer 'for all the injurious results which flow therefrom, by ordinary, natural sequence, without the interposition of any other negligent act or overpowering force.' Whether the injurious consequences may have been 'reasonably expected' to follow from the commission of the act is not at all determinative of the liability of the person who committed the act to respond to the person suffering therefrom. * * *"

Where the same act or omission is both a breach of contract and a tort, the matter of whether the plaintiff proceeds in tort or on contract may be of legal significance in connection with a responsibility limitation provision contained in the contract between the parties. Some courts give such a provision a much more strict and restricted construction when it is sought to assert it in connection with a claim based on negligence than they do when it is sought to be asserted against a claim based on breach of contract.

In the present case the contract between the defendant and the Iowa Public Service Company gave rise to the duty on the part of the defendant to exercise reasonable care in manufacturing and inspecting the equipment in question and that if the defendant failed to exercise such care it was guilty of negligence as to the Iowa Public Service Company. Such omission would also be a breach of the contract between the defendant and the Iowa Public Service Company. Therefore, the Iowa Public Service Company could have, except so far as limited or prevented by the responsibility provision in question, proceeded against the defendant either in tort or on contract. The plaintiffs as subrogees of the Iowa Public Service Company elected to proceed in tort. Where, as between the parties to a contract, an omission by one of the parties is a breach of contract and because of the contract also a tort as to the other party, such other party by suing in tort instead of on contract does not thereby render nugatory a responsibility limitation provision contained in the contract. In that situation the question is whether the responsibility limitation provision is to be construed as limiting the liability of the defendant for negligence or exonerating the defendant from liability for negligence.

There is next to be considered the matter of the applicable law. The present action is based on diversity of citizenship. Under Klaxon Co. v. Sten-

tor Electric Mfg. Co., 1941, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477, it is the duty of this Court to apply the Iowa conflict of laws rule. See Aluminum Co. of America v. Hully, 8 Cir., 1952, 200 F.2d 257, 261. In the case of Haverly v. Union Const. Co., 1945, 236 Iowa 278, 18 N.W.2d 629, at page 633, the Iowa Supreme Court stated:

> "The rule is laid down in Chicago, R. I. & P. R. Co. v. Lundquist, 206 Iowa 499, 221 N.W. 228, 230:
>
> " 'A contract is made at the time and place where the last act necessary to a complete meeting of the minds of the parties is performed.' "

See also Pasquel v. Owen, 8 Cir., 1950, 186 F.2d 263, 272. In the case of County Sav. Bank v. Jacobson, 1927, 202 Iowa 1263, 211 N.W. 864, it was held that the last act necessary to complete a contract is acceptance. It stated, at pages 865, 866 of 211 N.W.:

> "* * * In other words, the lex loci contractus is the place of acceptance. * * *"

 In the present action the "Change Order" of September 5, 1950, is regarded as an acceptance of the defendant's offer that acceptance took place in Iowa. If that "Order" is regarded as a counter-offer it was accepted by the delivery of the electric equipment to the Iowa Public Service Company. That delivery took place in Iowa. Therefore, it is clear that the applicable substantive law is that of Iowa.

It is the claim of the plaintiffs that, even if as claimed by the defendant the responsibility limitation provision does by its terms purport to relieve the defendant from liability for negligence, it is invalid. It is the contention of the plaintiffs that a party may not contract against the consequences of his negligence. They cite in support of that contention a statement to that effect contained in the opinion in the case Randall v. M. M. Moen Co., 1928, 206 Iowa 1319, 221 N.W. 944.

There are a number of Iowa cases in which the matter of the validity of a provision relieving a party from negligence has been passed on or referred to. The question first came before the Iowa Supreme Court in the case of Griswold v. Illinois Cent. R. Co., citations infra. In that case the lease between the railroad company and Griswold, leasing the latter a portion of the former's right of way for use for elevator purposes, contained a provision relieving the company from liability for damage by fire negligently communicated to Griswold's buildings on the leased premises by the company's engines. Due to the negligence of the company, fire was communicated to Griswold's buildings by one of its engines. When sued by Griswold for the damages sustained by him because of such negligence, the company set up the provision referred to as a defense. Griswold asserted that the provision was void. The Iowa Supreme Court first held that the provision was void, 1892, 53 N.W. 295. It then granted a rehearing and on rehearing in an opinion of considerable length in which the matter of the validity of the provision is considered at length it reversed its previous holding and held that the provision was valid, 1894, 90 Iowa 265, 57 N.W. 843, 24 L. R.A. 647. The holding in the Griswold case was followed by the Iowa Supreme Court in Kennedy v. Iowa State Ins. Co., 1902, 119 Iowa 29, 91 N.W. 831; City of New York Ins. Co. v. Chicago, B. & Q. Ry. Co., 1913, 159 Iowa 129, 140 N.W. 373; Gerlach v. Grain Shippers' Mut. Fire Ins. Ass'n, 1912, 156 Iowa 333, 136 N.W. 691. The Griswold case has been recognized and followed by the federal courts in cases in which the Iowa law was under consideration. Hartford Fire Ins Co. v. Chicago, M. & St. P. Ry. Co., C.C.Iowa 1894, 62 F. 904; same case 8 Cir., 1895, 70 F. 201, 30 L. R.A. 193, same case, 1898, 175 U.S. 91, 20 S.Ct. 33, 44 L.Ed. 84. In the case of Gerlach v. Grain Shippers' Mut. Fire Ins. Ass'n the Iowa Supreme Court stated, at page 693 of 136 N.W., that

it was "competent" for a lessee in leasing property "to release the lessor from obligation for any injury the lessor may occasion by his negligence." In the case of Lunt v. Grand Lodge Ancient Order United Workmen, 1929, 209 Iowa 1138, 229 N.W. 323, at page 324, the Iowa Supreme Court stated, that parties to a contract "may also specify the terms and conditions of liability, even though without the contract, recovery might be had." That Court makes the same statement in the case of Roeh v. Business Men's Protective Ass'n, 1914, 164 Iowa 199, 145 N.W. 479, at page 482, 51 L.R.A., N.S., 221. In both cases the Griswold case is cited in support of the statement. In the case of Andrew v. Breon, 1929, 208 Iowa 385, 226 N.W. 75, at page 78, the Iowa Supreme Court stated that "courts should be cautious in nullifying contracts." The Griswold case, among other cases, is cited in support of the statement.

 The case of Randall v. M. M. Moen Co., 1928, 206 Iowa 1319, 221 N.W. 944, which, as heretofore noted, is relied on by the plaintiffs in this connection, was an action in tort by a third person who was engaged in the construction of a building under a contract with the owner of the premises. The question arose as to the materiality of that contract. The Court, after passing upon that question, stated, at page 945 of 221 N.W.: " * * The defendant may not contract against the consequences of his negligence; * * *." That question was not involved in the case. The Court made no reference to its earlier holdings in Griswold v. Illinois Cent. R. Co., supra, Kennedy v. Iowa State Ins. Co., supra, and Gerlach v. Grain Shippers' Mut. Fire Ass'n, supra, in which it had upheld the validity of a contractual provision relieving a party from the consequences of his own negligence. The statement referred to is relied on by the plaintiffs in support of their contention as to validity. The statement was clearly dictum and has not been referred to by the Iowa Supreme Court since. Sections 574 and 575 of Restatement, Law of Contracts, are as follows:

§ 574.

"A bargain for exemption from liability for the consequences of negligence not falling greatly below the standard established by law for the protection of others against unreasonable risk of harm, is legal except in the cases stated in § 575."

§ 575.

"(1) A bargain for exemption from liability for the consequences of a wilful breach of duty is illegal, and a bargain for exemption from liability for the consequences of negligence is illegal if

"(a) the parties are employer and employee and the bargain relates to negligent injury of the employee in the course of the employment, or

"(b) one of the parties is charged with a duty of public service, and the bargain relates to negligence in the performance of any part of its duty to the public, for which it has received or been promised compensation.

"(2) A bargain by a common carrier or other person charged with a duty of public service limiting to a reasonable agreed valuation the amount of damages recoverable for injury to property by a non-wilful breach of duty is lawful."

It is believed that the Iowa law is in accord with those Sections.

In the case of Aluminum Co. of America v. Hully, 8 Cir., 1952, 200 F.2d 257, involving an indemnity agreement where the Pennsylvania law was held to be applicable, the United States Court of Appeals for this Circuit stated, at page 261:

"The agreement of the contractor contained in Article 24 of the contract herein to indemnify Alcoa against liability on account of personal injuries to employees of contractor arising out of or in any manner connected with the performance of the contract whether such injuries be caused by the negligence of

the owner or otherwise \* \* \* was valid and was not against public policy or void under Pennsylvania law, or *the law generally.* \* \* \*" (Emphasis supplied.)

It is the claim of the plaintiffs that the public character of the Iowa Public Service Company is of significance on the question under consideration. In their complaint the plaintiffs allege:

"Iowa Public Service Company is engaged, as a public utility, in the generation, transmission and sale of electricity in Iowa and South Dakota. Such business is charged with a public interest, Iowa Public Service Company owing a duty to the public generally, because of the inherently dangerous character of electricity to persons and to property, to protect the members of the public and their property from injury by reason of defective apparatus and equipment and, so far as is possible by the use of proper apparatus and equipment, to furnish a continuous flow of electricity to the public."

It is the contention of the plaintiffs that it would be against public policy to allow those furnishing electrical equipment to public utilities of the character and in the situation of the Iowa Public Service Company to relieve themselves from liability for negligence in connection with the equipment furnished.

Section 575 of Restatement of the Law of Contracts, heretofore set out, lists among the exemptions to the general rule stated in Section 574 the following:

"(b) one of the parties is charged with a *duty of public service,* and the bargain relates to negligence in the performance of any part of its duty to the public, for which it has received or been promised compensation."

The rule contained in that exception is in accord with the general rule. However, that rule is not applicable to the contracts of a party charged with public service in connection with a contract with a party to whom such party is not rendering public service. Sante Fe, Prescott & Pheonix Railway Company v. Grant Brothers Construction Company, 1913, 228 U.S. 177, 185, 33 S.Ct. 474, 57 L.Ed. 787; Griswold v. Illinois Cent. R. Co., 1894, 90 Iowa 265, 57 N.W. 843, 24 L.R.A. 647. In the case of Santa Fe, Prescott & Phoenix Railway Company v. Grant Brothers Construction Company, supra, the United States Supreme Court, in referring to the rule, stated, at page 185 of 228 U.S., at page 477 of 33 S.Ct.:

"Manifestly, this rule has no application when a railroad company is acting outside the performance of its duty as a common carrier. In such case, it is dealing with matters involving ordinary considerations of contractual relation; those who · choose to enter into engagements with it are not at a disadvantage; \* \* \*. The rule extends no further than the reason for it. \* \* \*"

In the present case the Iowa Public Service Company was free to enter into contracts with whom it wished upon such terms as it found acceptable for the acquisition of electrical equipment.

It is believed that under the Iowa law the Iowa Public Service Company and the defendant could validly contract to release or limit the liability of the defendant for negligence in connection with the equipment in question.

It is the contention of the plaintiffs that even if the Iowa Public Service Company and the defendant could validly contract to limit the liability of the defendant for negligence or relieve it from negligence, yet the responsibility limitation provision in the contract between them did not so limit or relieve.

The last sentence of that provision provides as follows: "The Company shall not in any event be liable for indirect or consequential damage." The defendant does not particularly stress this portion of the provision; it places particular stress on other parts of the provision. In some cases in which a re-

sponsibility limitation provision has been considered, the courts have had before them the question of what constitutes "consequential damages" within the terms of such a provision which provides that the vendor shall not be liable for such damages. Nelson v. Swedish Hospital, Minn.1954, 64 N.W.2d 38; Despatch Oven Co. v. Rauenhorst, 1949, 229 Minn. 436, 40 N.W.2d 73; Otis Elevator Co. v. Standard Const. Co., D.C.Minn. 1950, 92 F.Supp. 603. The famous English case of Hadley v. Baxendale, 9 Exch. 341, 156 Eng. Reprint 145, 5 Eng.Rul. Cases 502, defined consequential damages. The Minnesota Court follows Hadley v. Baxendale. See cases last cited. The Iowa Supreme Court also follows Hadley v. Baxendale. See Mentzer v. Western Union Tel. Co., 1895, 93 Iowa 752, 62 N.W. 1, 28 L.R.A. 72. The United States Court of Appeals for this Circuit has stated that there is confusion in the cases as to what constitutes consequential damages. United States v. Chicago, B. & Q. R. Co., 8 Cir., 1936, 82 F.2d 131, 136, 106 A.L.R. 942, certiorari denied, 1936, 298 U.S. 689, 56 S.Ct. 957, 80 L.Ed. 1408. Damages sustained by the explosion of a bottle containing a soft drink were held to be "special and consequential" within the purview of a provision in a sales contract excluding liability of the vendor for such damages. Maryland Cas. Co. v. Owens-Illinois Glass Co., D.C.W.Va. 1953, 116 F.Supp. 122.

It might be that some of the damages sustained by the Iowa Public Service Company for which recovery is sought herein might have the status of consequential damages under Hadley v. Baxendale, supra; Otis Elevator Co. v. Standard Const. Co., supra; Nelson v. Swedish Hospital, supra. However, the subrogation receipts heretofore referred to merely recite that the payment was made for loss and damage by fire. Due to the heat-generating proclivity of electricity when not properly conducted or transmitted it would seem where a fire has its origin in excessive heat occasioned by a defect in the instrumentality by which electricity is handled such fire would be regarded as being directly and proximately caused by the defect and the damages occasioned by the fire would be neither indirect nor consequential. See Roller v. Independent Silo Co., 1952, 242 Iowa 1277, 49 N.W.2d 838, 842.

In the present case it is clear that the damage was caused by the excessive heat generated in Cubicle No. 2. If that excessive heat was generated because of a defect in the equipment contained therein and the presence of that defect was due to negligence on the part of the defendant, it would seem that the damages caused to the equipment and the switch house thereby for which recovery is sought herein could not be regarded as indirect or consequential.

The plaintiffs contend that even if the Iowa Public Service Company and the defendant could validly contract to relieve the defendant from the consequences of its own negligence yet the language of the provision does not do so. The defendant contends that the language of the provision does relieve it from the consequences of the claimed negligence. The defendant places stress on the following language in the provision:

"The Company warrants that the apparatus to be delivered hereunder shall be of the kind and quality described in the specifications, and no other warranty, except of title, shall be implied. * * * The liability of the Company (except on warranty of title and on the liability respecting patents hereinafter set forth) arising out of the supplying of said apparatus, or its use, whether on warranties or otherwise, shall not in any case exceed the cost of correcting defects in the apparatus as above set forth, and, upon the expiration of said one year, all such liability shall terminate. * * *"

The plaintiffs call attention to the fact that the word "negligence" is not used in the provision and that the provision is a printed provision drafted entirely

by the defendant. The plaintiffs suggest that the absence of the word "negligence" from the provision when it might easily have been included in it when it was being drafted by the defendant is of significance.

The question as to whether the language used by the parties in a contract encompasses negligence has arisen most frequently in connection with indemnity contracts or contracts containing an indemnity provision.

In the case of Chicago & N. W. R. Co. v. Chicago Packaged Fuel Co., 7 Cir., 1950, 183 F.2d 630, at page 632, the Court stated:

> "It is true that contracts indemnifying parties against losses caused by their own negligence are generally subject to strict construction, as stated by the District Court, and generally, 'where the parties fail to refer expressly to negligence in their contract such failure evidences the parties' intention not to provide for indemnity for the indemnitee's negligent acts.' Annotation, 175 A.L.R. 10, at page 30. However, the Annotator there, at page 37, calls attention to the qualification of this strict construction rule in a number of cases where the language of the agreement was so broad as to indicate the intention of the parties that it should include negligence. * * *"

In the case of Santa Fe, Prescott & Phoenix Railway Company v. Grant Brothers Construction Company, 1913, 228 U.S. 177, 33 S.Ct. 474, 57 L.Ed. 787, there was involved a contract between a railroad company and a contractor relating to the grading of a branch line. The contract also covered the matter of transportation of the contractor's men and supplies by the company. Some of the contractor's supplies were destroyed by fire while in railroad cars on a siding. The contractor brought an action against the railroad company claiming that the fire was caused by the negligence of the railroad company. The contract between the railroad company and the contractor contained a provision " 'that the company shall assume no obligation or risk in case of accident or damage to men and supplies.' " The word "negligence" was not used in the provision. The contractor claimed that the railroad company could not validly contract against liability for its own negligence. The contractor also claimed that the provision did not encompass such negligence. The United States Supreme Court held that the provision barred recovery by the contractor. That Court stated, at pages 188, 189, of 228 U.S., at page 478 of 33 S.Ct.:

> "The parties, then, were free to make their own bargain as to this transportation and the liability which should attach to it. There is no rule of public policy which denies effect to their expressed intention, but, on the contrary, as the matter lies within the range of permissible agreement, the highest public policy is found in the enforcement of the contract which was actually made. Undoubtedly, it is not to be lightly concluded that the railroad company has been relieved from liability for its neglect, but, on the other hand, if this was the agreement as fairly interpreted, it is not to be arbitrarily overridden. The parties were on an equal footing. * * *"

It further stated, at page 192 of 228 U.S., at page 480 of 33 S.Ct., that there was " 'no reason why the ordinary rules of construction should not obtain, and the contract be given effect according to the intention of the parties.' " It further stated, at page 190 of 228 U.S., at page 479 of 33 S.Ct., that the parties "evidently had negligence in view." It further stated, at page 192 of 228 U.S., at page 480 of 33 S.Ct.:

> " * * * The observations of this court in McCormick v. Shippy, [2 Cir.] 124 F. 48, 59 C.C.A. 568, are appropriate: ' * * * It is well settled that the parties in such a case

have the right to provide by *apt language* against liability for negligence * * *.' " (Emphasis supplied.)

In the case of Ringling Bros.-Barnum & Bailey Combined Shows v. Olvera, 9 Cir., 1941, 119 F.2d 584, the Court had under consideration a provision in a contract which was relied upon by one of the parties to it as exempting it from its own negligence. The Court stated, at pages 586, 587:

"It will be noted that negligence is not mentioned as an excepted liability. Appellees claim the provision is so broad that it cannot be deemed to exempt the appellants from any sort of liability. There is not cited, nor are we able to find, any Florida case construing such a provision. However, the common law prevails in Florida. The United States Supreme Court, in determining the common law with regard to such agreements, before Erie Railway Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, has held that, though negligence is not mentioned in the exempting clauses, such broad provisions going to the essence of liability as 'all risk of loss or damage' * * * and 'no obligation or risk in case of accident or damage to men and supplies' relieve from liability for ordinary negligence * * *. Santa Fe [Prescott & Phoenix Railway Company] v. Grant Brothers Construction Company, 228 U.S. 177, 188–194, 33 S.Ct. 474, 478, 57 L.Ed. 787."

In accord with the view that a provision may encompass a party's own negligence even though it does not contain the word "negligence" are the cases of Griffiths v. Broderick, 1947, 27 Wash.2d 901, 182 P.2d 18, 175 A.L.R. 1, and Payne v. National Transit Co., D.C.Pa.1921, 300 F. 411, affirmed, National Transit Co. v. Davis, 3 Cir., 1925, 6 F.2d 729, certiorari denied, 1925, 269 U.S. 579, 46 S.Ct. 104, 70 L.Ed. 422.

It seems clear that it is not necessary that the parties make use of the word "negligence" in a provision in order to make the provision applicable to a party's own negligence and that it is sufficient if the parties by "apt language" include such negligence.

It is the claim of the plaintiffs that the strict construction rule is applicable to the provision in question in this case. In some of the cases the matter of the applicability or non-applicability of the strict construction rule has had to do with the question as to whether a particular provision encompassed a party's own negligence at all where there is no specific reference thereto. In other cases where specific reference has been made to a party's own negligence either specifically or by apt words, the matter of the applicability or non-applicability of the strict construction rule has to do with the scope of the coverage of the provision. The Iowa Supreme Court has not as yet specifically stated its views as to the applicability or non-applicability of the strict construction rule to contractual provisions relating to a party's own negligence. In the case of City of New York Ins. Co. v. Chicago, B. & Q. Ry. Co., supra, the Iowa Supreme Court upheld such a provision where the provision was at page 375 of 140 N.W., "to say the least, very queerly worded."

The case of Oscar Ruff Drug Co. v. Western Iowa Co., 1921, 191 Iowa 1035, 181 N.W. 408, 15 A.L.R. 962, involved a provision in a lease of a business building exempting the landlord from his own negligence. The lessee's stock of merchandise on the leased premises was destroyed by a collapse of the building and ensuing fire. The collapse was due to the lessor's negligence in connection with the making of repairs and alterations to the building. The lessee brought an action against the lessor for the damages sustained by him by reason of the lessor's negligence. The lessor relied upon the provision in the lease exempting him from liability for his own negligence. The Iowa Supreme Court held that the lessee's action was not barred by that

provision. The Iowa Supreme Court stated at page 412 of 181 N.W.:

> "It is true that the so-called exemption clause of the lease is stated in broad and sweeping general terms, but we cannot conceive that the waiver of damages resulting to the lessee from the negligence of the lessor, in making specific repairs upon the building in pursuance of a separate independent contract, resting upon a new consideration, could have been within the contemplation of the parties at the time the lease was entered into. No such repairs were in the mind of either party. It is our conclusion upon this point that, although it be conceded that plaintiff was occupying the premises at the time the building collapsed, under the terms and provisions of the lease that expired April 1st, he did not, by the provisions quoted, waive his right to claim damages for the total destruction of his stock of merchandise, as the result of the negligence of the defendant in repairing, altering, and reconstructing a portion of the building occupied by plaintiff, and in a measure at his instance and request."

The case of Mortrude v. Martin, 1919, 185 Iowa 1319, 172 N.W. 17, was an action brought by the employee of a lessee of a business building in the course of construction against the lessor and the lessor's architect and engineer. The plaintiff's employer had moved into the first floor of the building as soon as that part was built. The lessor continued the construction work above. The plaintiff claimed that as the result of negligence on the part of the lessor in connection with the further construction plaster fell from the ceiling. He sought to recover damages for the injuries resulting therefrom. The lease between the plaintiff's employer and the lessor contained a provision that the lessor could continue to build the building higher without the consent of the lessee or "without any claim" from the lessee. The lessor asserted that provision as a bar to the plaintiff's action. It was apparently assumed or conceded by the parties that the plaintiff was in the same position as his employer as to that provision. The jury returned a verdict for the plaintiff. On appeal the judgment, based on the verdict, was affirmed. The Iowa Supreme Court stated, at page 21 of 172 N.W.:

> " * * * The clause in the lease relied upon by defendants only waives the right of claim for damages resulting from the proper construction of the building, and not claim for damages because of negligence in the construction. Surely the parties did not contemplate by this provision that the landlord could proceed with the construction of additional stories to the building, in utter disregard of the rights of the tenant and of the landlord's duty to the tenant. * * * "

The matter of the construction of a provision in a contract which has to do with limitation of liability for negligence has been before the United States Court of Appeals for this Circuit in a number of fairly recent cases. None of them had to do with the law of Iowa. The case of General Mills, Inc. v. Goldman, 8 Cir., 1950, 184 F.2d 359, certiorari denied, 1951, 340 U.S. 947, 71 S.Ct. 532, 95 L.Ed. 683, was an action brought by the plaintiff, who was an assignee of the lessor, against the lessee for the destruction of a building on the leased premises. It was the claim of the plaintiff that the fire was caused by the negligence of the defendant. The defendant pleaded as a defense a provision in the lease which it claimed exonerated it from the claimed liability. The trial court was of the view that since the provision related to the exoneration of the defendant for its own negligence the provision should be strictly construed against it and held that the defendant was not exonerated from the claimed liability thereunder. On appeal the United States Court of Appeals reversed. It stated that the words used in the provision should not be

given a narrower meaning than they have in common parlance.

The case of Aluminum Co. of America v. Hully, 8 Cir., 1952, 200 F.2d 257, involved the scope of coverage of a provision in a construction contract between the owner and a contractor providing for indemnity to the owner against its negligence. The trial court was of the view that the provision should be strictly construed. It so construed the provision and denied the owner's claim for indemnity thereunder. On appeal the United States Court of Appeals reversed. The Court held that the words used were to be given their ordinary and usual significance. It held that the owner's claim for indemnity should be granted.

The case of Minneapolis-Moline Co. v. Chicago, M., St. P. & P. R. Co., 8 Cir., 1952, 199 F.2d 725, involved an indemnity provision in an industrial track contract between a railroad company and a party whose plant was located on one of the company's industrial tracks. The provision did not specifically refer to the matter of the railroad company's own negligence. The railroad company claimed indemnity under the provision for a judgment rendered against it based on its negligence. The trial court held that the railroad company was entitled to be indemnified thereunder. On appeal the United States Court of Appeals affirmed. That Court stated, at page 729:

"This contract is broad enough to exempt the Railroad Company from the result of its own negligence. * * * "

It further stated, at page 730:

"If this indemnity contract is the subject of construction it should be construed in the same manner as any other similar contract. * * "

It further stated, at page 731:

"As the language of the indemnity provision is clear and all-comprehensive, it can not be read out of the contract by construction or otherwise."

The case of Ocean Accident & Guarantee Corp. v. Jansen, 8 Cir., 1953, 203 F. 2d 682, was an action brought by the subrogee of the lessor against the lessee under an indemnity provision contained in the lease covering a premises used for tavern purposes. A tavern customer died as the result of injuries received on a stairs in the tavern. The personal representative of the decedent made claim against the lessor for his injuries, asserting that the stairs on which the decedent was injured did not comply with the provisions of an ordinance of the City of Omaha as to the width of the treads and as to a handrail. The lessor's insurer made settlement with the customer's personal representative and brought an action to recover the amount so paid under the indemnity provision in the lease. The trial court denied recovery. On appeal the United States Court of Appeals affirmed. The indemnity provision provided, in part, at page 683, that:

" ' * * * Lessee will protect the Lessor and save Lessor harmless against any claims or demands for damages on account of injuries resulting * * * from defects in any part of or arising from any cause connected with the use of the premises, or arising from any accident, injury or damage whatsoever, however caused to any person * * *.' "

The Court stated, at page 685:

"The rule is well established that indemnity agreements made between parties and under such circumstances as exist here will not be construed to obligate the indemnitor to indemnify the indemnitee against claims or losses arising from the indemnitee's own negligence unless it clearly and unequivocally appears that such was the intention. The rule is stated in Southern Bell Tel. & Tel. Co. v. Mayor and Board of Aldermen, 5 Cir., 74 F.2d 983, 984:

" 'It is well settled that a contract of indemnity will not be construed to indemnify the indemnitee against losses resulting to him through his

own negligent acts, where such intention is not expressed in unequivocal terms. North American Ry. Construction Co. v. Cincinnati Traction Co., 7 Cir., 172 F. 214, 215; Washington & Berkeley Bridge Co. v. Pennsylvania Steel Co., 4 Cir., 215 F. 32; Perry v. Payne, 217 Pa. 252, 66 A. 553, 11 L.R.A.,N.S., 1173, 10 Ann.Cas. 589; Mitchell v. Southern R. Co., 124 Ky. 146, 74 S.W. 216; Wallace v. United States, D.C., 16 F. 2d 309; [United States v. Wallace] 9 Cir., 18 F.2d 20; Buckeye Cotton Oil Co. v. Louisville & N. R. Co., 6 Cir., 24 F.2d 347; 31 C.J. 431; 14 R.C.L. 47.'

"The rule is further developed and discussed in an annotation on the subject of 'Limiting Liability for Own Negligence,' 175 A.L.R. 8.

"While the lease required Jansen to make repairs, the record does not disclose any obligation on his part to make alterations, additions or improvements such as would have been required to make the stair treads and railing literally and fully comply with the ordinance. The record shows that the condition of the stair treads and railing was the same at the time of both accidents as it was at the time of the beginning of Jansen's lease, and, while Section 7 of the lease is not included in the printed record, counsel for Jansen state in their brief that 'Paragraph 7 of the lease prohibits the lessee [Jansen] from making any alterations or additions or improvements in the premises without written consent of the lessor.' Hence the construction of the stairs, the stair treads, and the railing appears to have been under the exclusive control of the owner. Such a situation adds emphasis to the rule that absent a clear and unequivocal intent in an indemnity covenant of the character here involved, such an agreement will not be construed to indemnify the indemnitee against losses resulting to the indemnitee through his own negligence. * * *"

As heretofore noted, the Iowa Supreme Court held in the case of Oscar Ruff Drug Co. v. Western Iowa Co. that broad and sweeping general terms in a lease as to the non-liability of a lessor for his own negligence will not be held to be applicable to a situation which manifestly could not have been within the contemplation of the lessee and the lessor.

The plaintiffs cite and rely upon the case of Doughnut Mach. Corporation v. Bibbey, 1 Cir., 1933, 65 F.2d 634. In that case the defendant leased a doughnut making machine to the plaintiff. While the plaintiff was engaged in operating the machine, it jammed and splashed hot grease on the plaintiff causing her serious injury. She sued the defendant in tort for negligence, claiming that the defendant had been guilty of negligence in assembling or adjusting the ejector on the machine. The defendant set up a provision in the lease as a bar to the plaintiff's claim. On appeal the judgment in favor of the plaintiff was affirmed. The Court, in passing upon the provision as a claimed bar to the plaintiff's action, stated, at page 637:

"This warranty relates to defects in material and workmanship, and lessor's undertaking to make good such defects at its factory, followed by this general statement: 'This warranty being expressly in lieu of all other warranties, expressed or implied, and of all other obligations or liabilities on our part.' This language falls far short of being a plain agreement that the lessees should assume liability for personal injury caused by the defective machine's splashing hot grease upon the operator. Such a meaning is neither within the fair scope of the language used nor was it in the mind of either party to the lease. * *"

The Court stated, at page 635, that the action being between the parties to the contract the doctrine of the case of MacPherson v. Buick Motor Co., 1916, 217

N.Y. 382, 111 N.E. 1050, L.R.A.1916F, 696, Ann.Cas.1916C, 440, was not involved. The Court also stated that the rule of res ipsa loquitur was not applicable. There is a case comment on this case in 22 Illinois Bar Journal, 309–310 (1934).

None of the cases heretofore referred to have involved vendor-vendee contracts. Those contracts frequently contain a responsibility limitation provision. In a number of cases the question has arisen as to whether the language used in a particular responsibility limitation provision in a vendor-vendee contract encompassed negligence of the vendor. The courts which have to do with that question seem fairly well agreed that a responsibility limitation provision in a vendor-vendee contract need not contain the word "negligence" in order to encompass the negligence of the vendor and that it is sufficient if the words used by the parties when given their ordinary and usual significance do manifest the intent of the parties to encompass such negligence.

In the case of Hall-Scott Motor Car Co. v. Universal Ins. Co., 9 Cir., 1941, 122 F.2d 531, 533, certiorari denied, 1941, 314 U.S. 690, 62 S.Ct. 360, 86 L.Ed. 552, the subrogee of the owner of a power cruiser sought to recover from the vendor of an engine for the cruiser for the destruction of the cruiser by a fire allegedly caused by the negligence of the vendor in connection with the installation of the engine. The vendor relied upon a provision in the contract of sale as a bar to the action. The pertinent portion of the provision was as follows: " 'It is understood further Hall-Scott will not be held responsible for any damage to cruiser "Pacifica" * * * while the engine installation is being made.' " The Court referred to the fact that negligence of the vendor is not specifically referred to. The Court held that the provision was valid and exempted the vendor from liability for its own negligence in connection with the fire.

In the frequently cited case of Charles Lachman Co. v. Hercules Powder Co.,

D.C.Pa.1948, 79 F.Supp. 206, the plaintiff, a carpet manufacturer, sought to recover damages for loss of carpet by a fire claimed to have been caused by the spontaneous ignition of a chemical compound purchased by it from the defendant which had been used in connection with the sizing of the carpet. The contract of sale contained the following provision:

" ' * * * Seller makes no warranty of any kind, express or implied, except that the materials sold hereunder shall be of Seller's standard quality, and Buyer assumes all risk and liability whatsoever resulting from the use of such materials, whether used singly or in combination with other substances. * * ' "

The motion of the defendant for a summary judgment based on that provision was sustained. The Court stated, at page 207:

" * * * I find myself unable to accept the plaintiff's argument that 'The risks which a reasonable mind would think of would be risks that the sizing made with the Dresinol 42 would not be satisfactory.' Those risks were already fully eliminated by the first clause of the sentence that 'Seller makes no warranty of any kind, express or implied, except that the materials sold hereunder shall be of Seller's standard quality.' Having said this it was unnecessary to say more unless the parties meant more. * * * "

The Court also stated, at page 207:

" * * * In the present case the parties were both corporations engaged in large scale manufacturing. The plaintiff was under no compulsion to buy from the defendant and, if it desired to buy from it, had the choice of accepting the defendant's terms or going elsewhere."

In the case of Fairbanks, Morse & Co. v. Consolidated Fisheries Co., 3 Cir., 1951, 190 F.2d 817, the plaintiff, as the vendor of certain electrical equipment, sought to recover for the purchase price

thereof. The defendant counterclaimed for breach of warranty. The plaintiff made a motion for summary judgment claiming that under the warranty provisions of the contract of sale the defendant was precluded from recovery for the claimed breach of warranty. The defendant then asked leave to amend. In the proposed amendment the defendant alleged that prior to the furnishing of the equipment the plaintiff had furnished engineering service to it and in connection therewith the plaintiff had recommended to the defendant the equipment which was the subject of the sale and that the plaintiff was guilty of negligence in so doing. The trial court denied the motion to amend and sustained the plaintiff's motion for summary judgment. On appeal both rulings were affirmed. In affirming the ruling of the trial court on the motion of the defendant to amend, the Court stated, at pages 824, 825:

" * * * we are of the opinion that the disclaimer clauses of the sales agreement relieve plaintiff from any liability arising out of negligence in its role as engineer. Paragraph 6 of the basic contract declares that plaintiff shall not be liable in any manner for damages or otherwise with respect to the purpose, suitability, or operation of the machinery beyond its express agreements set forth in the basic contract or expressly incorporated into it. * * * We think the disclaimer clause is broad enough to comprehend even liability arising from any former relationship of engineer and client which may have existed between the parties. * * "

In the recent case of Shafer v. Reo Motors, Inc., 3 Cir., 1953, 205 F.2d 685, the plaintiff, who was the vendee of a motor coach, brought an action to recover damages from his vendor based on negligence. It was the claim of the plaintiff that the defendant was guilty of negligence in connection with the materials used in the gasoline tank of the coach and the supports for that tank.

The plaintiff claimed that as a consequence of that negligence the tank dragged on the street and set fire to the coach. The contract of sale, after setting forth the warranty of the vendor, continued as follows, at page 687:

" ' * * * this Warranty being expressly in lieu of all other Warranties expressed or implied and of all other obligations or liabilities on our part * * *.' "

The defendant made a motion for summary judgment based on the above portion of the provision, which motion was sustained by the trial court. On appeal that ruling was sustained. The Court stated, at page 687:

"We agree with the District Court's determination that the provision of the 'Standard Warranty' expressly releasing defendant from 'all other obligations or liabilities on our part' bars Shafer's recovery. * * * "

In a recent case comment on this case in 27 Temple Law Quarterly, 363–366 (1954), it is stated, at page 363:

" * * * The provision in the contract in the present case, that of making a limited warranty and excluding all other, is not an unusual provision in sales contracts. These provisions, although stated as a warranty, seem to amount to nothing more than a disclaimer of liability for negligence. * * * "

In the case of Santa Fe, Prescott & Phoenix Railway Company v. Grant Brothers Construction Company, supra, the United States Supreme Court, at page 190 of 228 U.S., at page 479 of 33 S.Ct., in construing the provision there involved to include negligence of the railroad, gave consideration to the fact that if the words exempting the railroad company from " 'all risk of loss or damage' " and " 'no obligation or risk in case of accident or damage' " were not held to exempt the railroad company from liability for its own negligence it would

leave those words without application.[2] In the present case the first three sentences of the provision in question refer to the warranty given and provide what the defendant is obligated to do in the event the equipment does not comply with the warranty. The fourth sentence contains the following words: "The liability of the Company * * * arising out of the supplying of said apparatus, or its use, whether on warranties or otherwise, shall not in any case exceed the cost of correcting defects in the apparatus * * *."

The defendant asserts that the parties in the first three sentences of the paragraph in question outlined the defendant's contractual duty in connection with the supplying of the equipment and covered the matter of its contractual liability in connection therewith and that to regard the words in the fourth sentence as not applicable to liability based upon negligence would be to regard them as meaningless and, in effect, read them out of the provision.

The parties have made use of the word "liability" in connection with the "supplying of said apparatus, or its use." In McElfresh v. Kirkendall, 1873, 36 Iowa 224, at page 226, the Court states:

> "Liability is responsibility; the state of one who is bound in law and justice, to do something which may be enforced by action. This liability may arise from contracts either express or implied, or in consequence of torts committed. * * *"

If the plaintiffs had instituted an action against the defendant based on contract, it would had to have been on the ground that the furnishing of the claimed defective part by the defendant constituted a breach of warranty. If so based, the action would have failed because the defendant by replacing Cubicle No. 2 without cost had fully discharged the liability assumed by it for breach of warranty.

The contract of sale between the defendant and the Iowa Public Service Company gave rise to a relationship wherein the defendant would be under liability to the Iowa Public Service Company in tort if it failed to exercise reasonable care in connection with the supplying of the equipment. The same contract gave rise to the contractual duty on the part of the defendant to supply equipment which met the warranty contained in the contract and subjected it to liability in contract for failure so to do.

The words in contracts of sale which the courts have held encompassed the liability of the vendor for negligence are frequently found in a provision of the contract which also covers the matter of warranty. Shafer v. Reo Motors, Inc., supra; Charles Lachman Co. v. Hercules Powder Co., supra.

While the matter of whether one party to a contract proceeds against the other party to the contract by an action on contract or by an action in tort is of legal significance, nevertheless frequently the one action is closely related to the other both factually and legally. In that connection the Court of Appeals of New York, in the case of Busch v. Interborough Rapid Transit Co., 1907, 187 N.Y. 388, 80 N.E. 197, at page 198, 10 Ann. Cas. 460, stated: "The dividing line between breaches of contract and torts is often dim and uncertain." In the case of Bender v. Candee Smith & Howland Co., Sup.1954, 136 N.Y.S.2d 425, at page 426, the Court stated: "The line between tort and breach of contract may not always be drawn sharply and at times the two may overlap."

Vendees' actions on contract against their vendors for breach of warranty are historically related to actions in tort. Greco v. S. S. Kresge Co., 1938, 277 N.Y. 26, 12 N.E.2d 557, 115 A.L.R. 1020. In that case the Court stated, at page 561 of 12 N.E.2d:

> "Prior to the action for assumpsit, the remedy for breach of warranty was an action on the case for

2. See also Cernohorsky v. Northern Liquid Gas Co., 1955, 268 Wis. 586, 68 N.W.2d. 429, 434.

**362**

deceit. Ames' Lectures on Legal History [1913], p. 136. Even today, an action for breach of warranty is, in some respects, an action in tort. Mere breach of contract, generally speaking, is not a tort. Yet the distinction·between torts and breaches of contract is, ofttimes, so dim and shadowy that no clear line of delineation may be observed and no accurate or satisfactory ·definition of either· may be formulated. * * "

The close relationship between the liability of a vendor to his vendee based on warranty and his liability to his vendee based on negligence would tend to lend support to the view of those courts which have regarded words encompassing negligence as being properly contained in a provision of a contract of sale relating to warranties. See Shafer v. Reo Motors, Inc., supra; Charles Lachman Co. v. Hercules Powder Co., supra.

 The question as to whether the provision in question or a somewhat similar provision in an Iowa contract, would or would not encompass a party's own negligence would come within the scope of the doctrine of the case Erie Railroad Company v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487.

Under the Iowa law the defendant and the Iowa Public Service Company could validly contract to limit the liability of the defendant for negligence in the furnishing of the equipment or to exempt the defendant from liability for negligence in connection therewith. Under the Iowa law the words used by the defendant and the Iowa Public Service Company in the provision in question are to be given their ordinary and usual significance.

It is the conclusion of the Court that giving the words used by the parties in the provision in question their usual and ordinary significance the provision does encompass the defendant's negligence.

It is the holding of the Court that the responsibility limitation provision in question was a part of the contract of sale between the Iowa Public Service Company and the defendant and because of that provision the Iowa Public Service Company could not have maintained an action against the defendant based upon its claimed negligence in connection with the manufacturing and inspecting of the equipment supplied by it for use by the Iowa Public Service Company and the plaintiffs as subrogees of the Iowa Public Service cannot now maintain such action.

Because of the holding of the Court on the defendant's affirmative defense, the issues between the parties as to negligence and contributory negligence are not passed upon.

It is ordered that judgment shall be entered in favor of the defendant.

It is further ordered that under Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A., the findings of fact, conclusions of law and order for judgment in the foregoing opinion shall constitute the findings of fact, conclusions of law and order for judgment in this case.